STATE OF IOWA

AT

DES MOINES, JANUARY TERM, A. D. 1904,

AND IN THE FIFTY-EIGHTH YEAR OF THE STATE.

| 125 | 1 |
|-----|-----|
| 131 | 509 |
| 125 | 1 |
| 143 | 70 |

---

MARY CATHERINE SCHNEIDER, Appellant, v. GERTRUDE
SCHNEIDER, B. WESSLING, and B. WESSLING, Guardian
of GERTRUDE SCHNEIDER, an insane person, Appellees.

**Practice:** EVIDENCE. A mere denial that letters written in a foreign
1 language have been correctly translated, where the record con-
tains the letters, is insufficient to put the correctness of the
translation in issue, even though there is no special proof of their
correctness.

**Fraud:** EVIDENCE. Evidence considered and held to show that a sister
2 of a decedent was induced, by the false representations of the
administrator, to convey to him her interest in the estate at less
than its value.

VOL. 125 IA.—1                    1

Confidential relation: PRESUMPTION OF FRAUD. Wherever a fiduciary or confidential relation exists at the time of a transaction, the law presumes fraud where the party in whom the confidence is reposed obtains from the other, in his own interest, an inconscionable contract.

Confidential relation: EVIDENCE. Family relationship alone will not raise a presumption of fraud in a contract between the parties, but is a strong circumstance to be considered in connection with the other evidence of trust and confidence. Evidence considered and held to establish a confidential relation.

Principal and agent: FRAUD. An agent who purchases from his principal the subject of the agency is held to a strict accountability for the truth of his representations concerning it. Evidence considered and held to establish the relation of principal and agent.

Trusts: POSSESSION OF LAND BY ADMINISTRATOR. Where an administrator, in the absence of an heir or devisee, takes possession of real property and receives the rents and profits, he is chargeable, at least to the extent of the rents, as a trustee.

Fraud: REPRESENTATIONS OF TITLE. The representation of an administrator made to an heir residing in a foreign country, with whom a confidential relation exists, for the purpose of inducing a sale to him, that her title to the real property of the estate is subject to a life estate in another, is not a conclusion of law but the statement of a fact, which if false will support a charge of fraud.

Rescission: TENDER. Where it is sought to avoid a sale of land on the ground of fraud, a tender in open court of the writings in relation thereto and waiver of all claim thereon which is made of record, is a sufficient rescission of the contract to authorize the relief.

Specific performance. Specific performance of a contract to sell land will not be decreed where there is any trace of fraud.

*Appeal from Carroll District Court.*— HON. Z. A. CHURCH, Judge.

MONDAY, JANUARY 25, 1904.

THE opinion states the case.— *Reversed.*

*Heinz & Fisher* and *George W. Paine,* for appellant.

*Salinger & Korte,* for appellees.

WEAVER, J.— On November 30, 1898, Caspar Schneider, a resident of Carroll county, Iowa, died intestate, leaving Gertrude Schneider, his widow, and Mary Catherine Schneider, his sister, his only heirs at law and next of kin. Gertrude Schneider is, and for some years has been, insane, and confined in the State Hospital at Clarinda, and is under the guardianship of B. Wessling. The intestate died seised of an eighty-acre tract of land in Carroll county, and a lot in the town of Breda. So far as appears, the property was unincumbered, and there were little or no liabilities against the estate, except a few small claims arising from the expenses of the last sickness and burial of the decedent. On December 16, 1898, Wessling was appointed administrator of the estate. Mary Catherine Schneider is, and during all her lifetime has been, a resident of Germany. About two years after the appointment of the administrator, when the estate had been substantially settled, and the administrator was about to be discharged, said Mary Catherine Schneider, acting through the German consul at Chicago, and attorneys employed by him, brought this action in equity for the partition of the eighty-acre tract, naming as the only defendants the widow, Gertrude Schneider, and B. Wessling, as her guardian. The petition alleged the death of Caspar Schneider intestate, while seised of said real estate, and that the title to the said property thereby became vested in plaintiff and the defendant Gertrude in equal shares, and demanded partition accordingly. The defendant guardian answered this petition, admitting all the material allegations of the petition, except the present ownership by plaintiff of any interest in the land, and alleged that before the commencement of the suit, plaintiff had " sold and disposed of her interest in and to said land," but did not allege to whom the sale had been made. At the next term of the district court, the cause being still pending, B. Wessling appeared, and upon his application, was made a defendant in his own right, and alleged he was himself the owner of the

undivided half interest in the land claimed by plaintiff, having obtained the same by purchase from her. By a subsequent amendment to his pleading, he sets out certain letters between himself and plaintiff, upon which he relies as a contract of sale to himself, and, after alleging that he has performed the agreement on his part, asks that the title be confirmed in him. Plaintiff, replying, admits the writing of the letters, and says she was induced thereto by the fraud and deceit of Wessling, and further says that at a subsequent date the proposed or attempted sale was abandoned by mutual consent.

I. Before proceeding to a consideration of the merits of the case, it is necessary to examine a question raised by appellee as to the record. The evidence consists largely in letters which are written in the German language, and are said to have passed between plaintiff and Wessling. The appellee objects that the alleged translations set out in appellant's abstract are not proved to be correct, and he denies that they are correct, but does not seek to enlighten this court by any statement of what he believes to be the true interpretation. The letters themselves, in their original form were offered in evidence, and the appellant sets out in her abstract what she claims to be their contents. This she had the right to do, and appellees cannot, by a bare denial, put the correctness of such statement in issue. Supreme Court rules, section 31 (old rule 22). We shall therefore treat the letters as being correctly set forth in the abstract.

*1. PRACTICE: evidence.*

II. The record shows that Wessling, a man about seventy years of age, was the plaintiff's cousin, although for some reason he addresses her as " niece." He is evidently a man of intelligence, a native of Germany, and, at the time of the transaction under inquiry, had been a resident of Carroll county for many years. Plaintiff, about sixty-four years old, has never lived elsewhere than in Germany, has never visited this country, and is ignor-

*2. FRAUD: evidence.*

ant of its laws and customs.    On the day after the burial of
Caspar Schneider, Wessling wrote to plaintiff, addressing her
as " Dear Niece," and gave her a detailed account of the ill-
ness and death of her brother.    He then adds:    " I have at-
tended to everything.    He had a nice funeral on the 3rd of
December.    Let him rest in the Lord.    The worst was that
he was unable to arrange his earthly affairs; he was bereft
of speech too soon and died intestate, and his wife is in
the insane asylum you know.    Now the talk was that the
state would take all the property but then I stepped in and
have been appointed guardian by the court.    Then it was said
I would have to have an attorney who would have the legal
knowledge and I was well acquainted in Carroll for I have
served as juryman there for twenty years.    I have had the
law expounded to me and it turns out that the state could not
take more than one-half of all the property that is here, city
property valued at $400, and the land at $3,000.    But I can-
not sell it as long as your sister-in-law lives."    On January 6,
1899, he wrote plaintiff again, acknowledging receipt of a
letter from her, and saying, among other things:    " I was in
Carroll the day of your brother's death because here the gen-
eral talk was that the state would get the whole property; so
I saw my brother Joseph and your brother-in-law Henry
Ailing (his wife is the sister of your brother's wife) we had
a talk and they said unanimously ' You are the oldest and
have served for a number of years as a juror so had better
go and inquire into it thoroughly,' and I did.    *    *    *
The property cannot be sold as long as your brother's wife
lives.    Should she recover again, then she can take possession
of the whole property as long as she lives."    Referring ap-
parently to a statement in plaintiff's letter to the effect that
she had received a letter from a lawyer at Carroll, he warns
her to beware of such assistance saying, " he knows how to
charge $5 for an hour's work.    And what is it he writes
you ?    He offers himself to you that he can procure your
share for you.    Yes if he can get ten dollars from every $100

for his work. That is the way with lawyers in America. I will say so much; leave his letter unanswered because I can procure it for you and much cheaper." He then asks her for a power of attorney, and adds: "Dear Niece, do not be alarmed about your capital. I have got a complete bond in court for all the property what is there, above all, I have undertaken it and will manage it as well as my own." Responding to information thus imparted, plaintiff on January 28, 1899, wrote Wessling as follows: "Dear Cousin: * * * I am glad you have taken charge of the affairs of my deceased brother. * * * As I have already reached a good age and as conditions over there are strange to me I will make you the following proposition. Dear Cousin; what will you give me if I will make over to you my share in the leavings of my deceased brother? I believe it is better for both of us if we shall agree in this matter."

If defendant replied directly to this inquiry, it does not appear in the record. It is quite probable, however, that the entire correspondence is not in evidence. Under date of May 7, 1899, he writes: "Now as to the inheritance of your deceased brother. I can give you the following information. I have inquired thoroughly into everything before I could write you. This is the situation, as long as your sister-in-law lives nothing can be sold and I must keep up everything just so as at the time your brother was living. * * * She may live a long time yet and may not. She may recover and she may not. It is impossible for us to know; but I said as long as she lives it must remain as when your brother lived. I have had very much work in this matter but have undertaken it and will carry it out, because we are here, we have taken hold of the matter and will look out for you also so you will receive your share. How it will go further I cannot at present say. It will come before the court in September, then I will know how it is done." On September 3, 1899, he again writes, explaining that he has been waiting because he wished to obtain infor-

mation about the whole matter, and says: - "Now I have made up my mind since I have talked the matter over with a sensible man. I will give you $1,000 for your share in the inheritance of your brother. It may be that in five or ten years it will be worth more. The matter is thus; nothing can be sold as long as your sister-in-law lives. The court says to me you can buy Schneider's sister's share but you can get nothing as long as Gertrude Schneider lives, should she recover she will be master of all as long as she lives. But understand it right; she can devise only one-half to her relatives; or should she die where she is now the state will get one-half of the whole property that is there. Now you know how the matter is situated as to everything. I have said to my wife and children I would pay you $1,000 for your share. Of course I will have no benefit of it. While I am still vigorous I am with one foot in the grave, for on March 15th, I have passed my seventieth year. I only want to do so that you might derive a little benefit from your deceased brother's property should you live a few years longer." He proceeds then to explain that his offer of $1,000 is upon condition that payment of the principal sum be deferred for ten years, with interest payable annually at five per cent., and closes by saying: " I only do so for you, for had I not taken hold everything would have gone into strange hands and then I believe you would not get a dollar. Now, dear niece, you must follow your own will. If you can do better I am entirely satisfied. I remain your loving cousin." The next letter in evidence is dated April 12, 1900, and is the communication which, with plaintiff's answer thereto, is relied upon by appellee as constituting the contract of sale. Among other things, he says: " I have written you in February and by your letter I see you did not have my letter when you wrote this one. * * * I had stated everything explicitly about your deceased brother's property. It is this that the property cannot be sold as long as your sister-in-law lives because the law says your sister-in-law may be in the asylum

ten or fifteen years and then get well and would then have the right to have possession of all the property as long as she lives. Neither can I borrow any money on the property. Everything must remain just as during the life of your brother. * * * Now as to your inheritance from your brother I will now say what I will do. If you want to leave the capital stand until the whole property can be sold I will take it and will send you over your fifty dollars interest; and as soon as it can be sold you shall have a thousand dollars immediately. I cannot do better. If you want this, answer immediately then I will have a contract of purchase prepared which you are to sign so you may be sure of your money." On April 26, 1900, the plaintiff, replying to the foregoing letter, said: " * * * In regard to the inheritance I am agreed and satisfied with your offer in the letter of April 12th."

On May 29, 1900, Wessling wrote plaintiff, inclosing a form of contract to be executed by her; also a promissory note for $1,000, payable ten years after date, with annual interest at five per cent. This was written in English, with a translation thereof into the German language, and was signed by the defendant, his wife and son. Plaintiff did not execute the contract sent her, nor did she at once respond to defendant's letter. It would seem she had at this time become suspicious that defendant was not acting in entire good faith, and soon placed the matter in the hands of the German consul. The correspondence was resumed and continued over a period of several months. The defendant, after offering to pay the thousand dollars in yearly installments, and at another time offering to pay cash, manifested some resentment, and on December 9, 1900, wrote her that she could sell her interest to other parties, if she wished to do so, for he had " concluded we don't want it any more." On January 25, 1901, he wrote her to return the papers he had sent her, and says, " The contract as you wrote last year we will drop." In nearly every letter he protests that, in accepting the duty

of settling up the estate and in making his offer of pur-
chase, he is actuated by no motive of self-interest, but solely
out of regard for his niece, to protect her from the avarice
of lawyers, court officers, and strangers, who would otherwise
have absorbed the entire property. Over and over again,
and even in his last letter, announcing that the contract was
dropped, he reiterates his strange legal proposition that her
property in the estate was absolutely unavailable to her or to
her grantee until the death of the widow of Caspar Schneider,
and gives her to understand his willingness to relieve her of
such an undesirable asset, even at a sacrifice to himself, if she
wished to accept his original proposition. As the rights of
the parties must turn very largely upon the question whether
defendant occupied any such relation to plaintiff as justified
her in reposing special confidence in him, and in being in-
fluenced by his judgment and representations, we have deemed
this extended statement of the evidence material to a proper
understanding of the merits.                                  •

The fact that this woman was grossly deceived, and was
thereby led into a consent to transfer her interest in the estate
**3. CONFIDENTIAL RELATION: presumption of fraud.** to defendant for very much less than he him-
self estimates it to be worth, is too evident for
controversy. He informed her that the real estate was valued
at $3,400, and, from his record in the matter, we can safely
conclude that he did not overestimate it. Then, by repeated
and emphatic declarations to her that this property was
subject to a life tenancy in Gertrude Schneider, and could not
be sold during the lifetime of the latter, but must be pre-
served as it stood before the brother's death, he obtains from
her an acceptance of an offer of $1,000, on long deferred pay-
ments, at a low rate of interest. In other words, he was
to get the property at about sixty per cent. of its admitted
value, because he induced plaintiff to believe her title was in-
cumbered by the life interest of another person, and that her
enjoyment of the benefits of the property was liable to be
postponed for many years. That statement was not true,

and he now asks a court of equity to confirm his title to the fruits of his falsehood. Is he entitled to such relief? In support of his claim, his counsel tell us that " a court of equity will not sit to declare a trust against a litigant simply because he has lied." If the principle here invoked is available in controversies of this kind, no one who reads the record will question the appropriateness of the refuge thus sought by the appellee. Fortunately for the ends of justice, this mesh in the net of the law through which some wrongdoers find exit does not furnish a way of universal escape. Where the relations of the parties, or the circumstances in which they are placed, are such that one of them, acting as a reasonable person, places special trust and confidence in the other, the latter cannot with impunity abuse that trust and confidence to his own profit. It is well settled that where it appears that a fiduciary or confidential relation existed between the parties at the time of the transaction alleged to be fraudulent, such as trustee and *cestui que* trust, principal and agent, attorney and client, husband and wife, guardian and ward, or where one of the parties for any other reason possesses influence or power over the other, the law raises a presumption of fraud whenever the party in whom the confidence is reposed obtains from the other a contract to his own profit. 14 Am. & Eng. Enc. Law (2d Ed.) 194.

III. It may be conceded that the family relation between appellant and appellee is not of itself sufficient to justi-

4. CONFIDENTIAL RELATION: evidence.
fy such a presumption. Even the nearer relationship of parent and child, or brother and sister, has been held insufficient of itself for that purpose. *Tenbrook v. Brown,* 17 Ind. 410; *Reehling v. Byers,* 94 Pa. 316; *Reeves v. Howard,* 118 Iowa, 121. But it is universally held that family relationship and confidence between the parties, and relations of friendship and confidence, even where no family tie exists, are material and often most persuasive circumstances for the consideration of the court or jury in determining whether the alleged fraud was in fact perpe-

trated.    The vital question is whether there was confidence reposed by one in the other, whether the party who alleges the wrong dealt with the other at arm's length, under circumstances where, as a reasonable person, she ought not to have been misled; or whether, having placed confidence in the other, either as a relative, friend, or adviser, the other took advantage of her faith and dependence to enrich himself at her expense.    If that fact be found, the court will not only refuse to enforce a contract thus wrongfully obtained, but will compel the wrongdoer to make restitution, where necessary to effect justice; and this it will do, not on the theory of declaring a trust against him " simply because he has lied," but because it is a fundamental principle in equity that one who has invited another to place confidence in him shall not be permitted to profit by a betrayal of it.    But it is insisted that the evidence does not disclose such circumstances in the case before us.

As we read the record, this conclusion can be found only by ignoring or distorting the meaning of admitted facts. The very fact of the family relationship of these parties; their early acquaintance; the defendant's presence at the burial and death of her brother; his promptness and kindness in writing her the sad news; his expression of affectionate solicitude in her behalf; his oft-repeated assurances that he had taken charge and was managing the property in her interest, and was expecting little or no compensation for his services — were more than sufficient to attract the confidence of this simple old woman across the sea, and induce her to rely implicitly upon his faithfulness in securing and preserving her rights in the estate.    This confidence he took care to fortify by calling attention to his experience as a juror, and repeating for her benefit the advice and direction which he claimed to have received from skilled counsel and from the court. What is still more significant, he interefered to prevent her employment of independent counsel, and assured her that he could get her share for her " much cheaper " than would any

one else. What more natural than that she should believe his false representation that the land was incumbered by a life estate in the widow of Caspar Schneider, or that, so believing, she should accept an inadequate offer in order to avoid an indefinite postponement of the beneficial use of her inheritance? The falsity of this representation cannot be excused or palliated on the plea that it was an honest mistake. Perhaps such charitable inference could be permitted, but for appellee's persistent assertion that he had laid the question before counsel and before the court, and had been advised that such was the legal status of the title to the land of which Caspar Schneider died seised. Our confidence in the intelligence and integrity of the court and counsel compels us to believe that no such advice was ever given, and that the representation to plaintiff was made with intent to deceive. But even if made in good faith, the defendant cannot take advantage of the mistake thus induced by his own representations to one placing special trust and confidence in him, without being chargeable with constructive fraud. *Lampman v. Lampman,* 118 Iowa 140; *Haggarth v. Weaving,* L. R. 12 Eq. 320; *Miner v. Medbury,* 6 Wis. 295.

IV. Defendant is also fairly chargeable with the duties and responsibilities of an agent of the plaintiff in respect to 5. PRINCIPAL AND this property, and it is one of the most familiar AGENT: fraud. rules of law that an agent who purchases from his principal the subject of the agency is held to the strictest accountability for the truth of his representations concerning it. That he became plaintiff's agent, in the full legal sense of the term, is shown by the correspondence between them, and by his own acts in the premises. As we have seen, he dissuaded her from employing counsel, and told her he would look after her interests, and she evidently took him at his word; and, until after he had obtained her acceptance of his offer to purchase the land, she left the matter entirely in his hands. His assertion frequently made that he was doing these things in her interest must be taken as meaning some-

thing, and she was justified in regarding him not only as a trusted relative and friend, but her personal representative as well.

V.    Again, there is a very just sense in which defendant may be regarded as a trustee for the use of the plaintiff. 6. TRUSTS: possession of land by administrator. Waiving the question whether his appointment as administrator, in itself, raises or implies a trust relation which would prevent his becoming a purchaser of the real estate, or conceding, if it is desired, that no such relation arises between administrator and heir, we have a statute (Code, section 3333) by which, upon the death of the owner of land, if no heir or devisee be present, competent to take possession of such real estate, the administrator "may do so, and demand and receive the rents and profits, and do all the other acts which may be for the benefit of the persons entitled to the same." Such was the situation here. Of the two persons to whom the land descended, one was a resident of Germany, and the other was confined in a hospital for the insane. Whether professing to act under this authority, or from a disinterested desire to preserve the property for these women, does not clearly appear; but defendant did in fact assume possession and control of the real estate, leasing the same and receiving the rents, and to this extent, at least, he is clearly chargeable as trustee. Let us suppose, for instance, that, instead of buying the land of his beneficiary upon the strength of false representations, this administrator had bought it of the county treasurer at tax sale; would a court of equity confirm in him a title thus obtained? We think no one will care to affirm this proposition, but if we are to hold, as appellee insists, that there was no relation of trust or confidence between the parties in respect to the land there would be no good reason for invalidating a tax deed thus obtained.

VI.    It is next said, as a reason why plaintiff should not be granted relief, that defendant's representations were matters of opinion or representations as to the law, and

therefore will not sustain a charge of fraud.    The rule upon
7. Fraud:        which appellee here relies is not without marked
representations
of title.        exceptions.    A statement respecting the condi-
tion of title to property, while in one sense a legal conclusion,
is yet in one sense so far an assertion of fact that, if untrue,
it affords under some circumstances at least sufficient grounds
for equitable relief to the party who thereby has been de-
cived.    Quite in line with the case at bar it has been held that
one person who induces another to sell land by persuading him
that his title is but a life estate, when in fact it is a fee,
may be compelled to make a reconveyance.    *Hogan v. Wix-
ted,* 138 Mass. 270.    Special circumstances of trust or over-
reaching may justify the court in setting aside a contract for
representations which under other circumstances would be re-
garded as simple statements of opinion.    *Varner v. Carsen,*
59 Tex. 305.    The same statements may be regarded as
false representations, or mere expressions of opinion, accord-
ing to the circumstances of the particular case.    *Reeves v.
Corning* (C. C.) 51 Fed. Rep. 774.    An opinion falsely ex-
pressed with intent to deceive, and which does deceive, is an
actionable false representation.    *Montgomery S. R. R. v.
Matthews,* 77 Ala. 357 (54 Am. Rep. 60) ; *Stebbins v. Eddy,*
4 Mason 417, Fed. Cas. No 13,342.    A party having su-
perior knowledge of the property sold, and giving a false
opinion in regard to a matter of fact, with intent to affect the
price to be paid, is guilty of fraud.    *Collins v. Jackson,* 54
Mich. 186 (19 N. W. Rep. 947).    Whether a false state-
ment of opinion amounts to a fraud depends largely, if not
entirely, upon whether the parties do or do not deal on equal
terms.    If· the person to whom the statement is made has
reason to rely, and does rely, upon the other, as a friendly
adviser, and not as one trying to drive a good bargain at his
expense, he will be granted relief if such confidence be
abused.    See note to *Thompson v. Ins. Co.,* 75 Me. 69 (46
Am. Rep. 360).    Where in a contract of sale the parties
are not equally familiar with the value of the property, and

one of them expressly relies upon the knowledge and representations of the other, false statements of value, which are ordinarily held to be mere matters of opinion, are fraudulent. The rule of *caveat emptor* does not apply in such cases. *Picard v. McCormick,* 11 Mich. 68.   One who misleads another who comes to him for information will not be suffered to profit by it.   *Converse v. Blumrich,* 14 Mich. 109 (90 Am. Dec. 230).   It may further well be said that the representation made by the appellee concerning the existence of a life estate in the land is not a mere statement of a legal proposition.   The citizen of one country is not presumed to know the law of a foreign jurisdiction, nor will the courts even take judicial notice of such laws.   They are regarded, not as matters of law, but as facts, to be proved as other facts. Am. & Eng. Enc. Law (2d Ed.) page 1057.   It follows, upon this doctrine, that as between these parties, residents of different jurisdictions, and subjects of different sovereignties, the defendant's representations as to the law of Iowa affecting the plaintiff's title to land here situated was a representation of fact, in the strict legal sense of the word.

VII.   It is the contention of the appellee that there has been no such rescission or offer to rescind the contract, or to place him in *statu quo,* as will enable the court to entertain the plaintiff's claim.   We think otherwise. The form of contract sent to plaintiff for her signature is not shown to have been executed, and its return is therefore not essential to a rescission.   The note written in English was in fact tendered in open court.   The note written in German was a mere copy or duplicate of the other, which was not intended, in any event, to evidence any other contract or debt.   Plaintiff, by her counsel, waived all claim thereon, and the waiver was made of record.   We see no reason to deny the authority of counsel representing the plaintiff, seeking relief against the enforcement of such contract, to waive and renounce all rights and benefits thereunder.   The offer made in behalf of plaintiff was sufficient.

*8. RESCISSION: tender.*

In equity, a willingness and readiness to do an act is all that is required; and, if the plaintiff be otherwise entitled to relief, the court will not deny it simply because no profert in evidence has been made of the subject of the tender, but will, by its decree, if it be deemed necessary for defendant's protection, require the act to be done before the relief becomes effective.

VIII. Counsel upon both sides argue that while this action, in its form, is in partition, the issue presented by the appeal is substantially whether the defendant shall have specific performance of the alleged contract to sell. If this be correct, the facts which we have already found to be established by the evidence afford abundant and imperative reasons why such enforcement should be denied. It requires a less flagrant case of fraud or undue advantage to prevent specific performance than to recover damages. Any trace of unfairness or fraud will render specific performance impossible. 22 Am. & Eng. Enc. Law (1st Ed.) 1022; *Frisby v. Ballance*, 39 Am. Dec. 409; *Cathcart v. Robinson*, 5 Pet. 269 (8 L. Ed. 120). As we have already found the contract tainted with fraud, the question of its enforcement need not be farther considered.

9. SPECIFIC PERFORMANCE.

The conclusions render necessary a reversal of the decree appealed from. The cause will be remanded to the trial court, with directions to deny the defendant B. Wessling the relief asked by him, and to order a partition of the land as prayed by the plaintiff. The costs of this appeal will be taxed against the defendant Wessling in his individual capacity.—*Reversed.*